IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jacob Doyle Corman, III,                   :
individually and as a parent of two        :
minor school children; Jesse Wills         :
Topper, individually and as a parent of    :
two minor school children; Calvary         :
Academy; Hillcrest Christian               :
Academy; James Reich and Michelle          :
Reich, individually and as parents of      :
three minor school children; Adam          :
McClure and Chelsea McClure,               :
individually and as parents of one         :
minor special needs school child;          :
Victoria T. Baptiste, individually and     :
as a parent of two special needs           :
school children; Jennifer D. Baldacci,     :
individually and as a parent of one        :
school child; Klint Neiman and             :
Amanda Palmer, individually and as         :
parents of two minor school children;      :
Penncrest School District; Chestnut        :
Ridge School District and West York        :
Area School District,                      :
                        Petitioners        :
                                           :
            v.                             :
                                           :
Acting Secretary of the Pennsylvania       :
Department of Health,                      :   No. 294 M.D. 2021
                        Respondent         :   Argued: October 20, 2021


BEFORE:    HONORABLE MARY HANNAH LEAVITT, Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge

OPINION
BY JUDGE FIZZANO CANNON                    FILED: November 10, 2021

This case presents a challenge by Petitioners Jacob Doyle Corman, III, Jesse Wills Topper, Calvary Academy, Hillcrest Christian Academy, James and Michelle Reich, Adam and Chelsea McClure, Victoria T. Baptiste, Jennifer D. Baldacci, Klint Neiman and Amanda Palmer, Penncrest School District, Chestnut Ridge School District, and West York Area School District (collectively, Petitioners) to the "Order of the Acting Secretary of the Pennsylvania Department of Health Directing Face Coverings in School Entities" (Masking Order) issued on August 31, 2021, by Alison M. Beam, the Acting Secretary of Health[1] (Acting Secretary or Respondent), which imposed an open-ended general masking requirement effective September 7, 2021, on all teachers, students, school staff, and visitors within Pennsylvania's schools, regardless of vaccination status, with certain exceptions. Petitioners' underlying First Amended Petition for Review (Amended Petition)[2] alleges the Masking Order is void *ab initio* as a result of the Acting Secretary's failure to comply with the requirements of Pennsylvania law in imposing the

---

[1] Although Alison M. Beam is identified in the Masking Order as the "Acting Secretary of the Pennsylvania Department of Health," her actual title is "Acting Secretary of Health." *See* Section 205 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended* (Administrative Code), 71 P.S. § 66 (stating the heads of the Commonwealth's administrative departments and their respective titles).

[2] As discussed *infra*, Petitioners originally filed their Petition for Review on September 3, 2021. On September 24, 2021, Petitioners filed Petitioners' Motion for Leave to File Amended Petition for Review (Petition to Amend) seeking to add the Penncrest School District, Chestnut Ridge School District, and West York Area School District as additional petitioners. *See* Petition to Amend. This Court granted the Petition to Amend and docketed the Amended Petition on September 27, 2021, at which time the Amended Petition became the operative filing before this Court. *See* Commonwealth Court Order dated September 27, 2021. We note that, by stipulation filed October 4, 2021, the parties jointly agreed that Respondent would not need to file a responsive pleading to the Amended Petition, if necessary, until 14 days after the Court's resolution of the parties' respective applications for summary relief presently before the Court. *See* Stipulation filed October 4, 2021, at 1-2.

Masking Order and seeks an injunction preventing the Acting Secretary from enforcing the Masking Order. The Amended Petition further claims that the Masking Order violates the non-delegation doctrine.

Before the Court currently are Petitioners' Application for Summary Relief and Entry of Judgment Pursuant to Pa.R.A.P. 1532 and In Accordance With the Court's September 27, 2021 Order (Petitioners' Application) and Respondent's Application for Summary Relief (Respondent's Application) filed by the Acting Secretary.

Preliminarily, we note that we express herein no opinion regarding the science or efficacy of mask-wearing or the politics underlying the considerable controversy the subject continues to engender. *See Wolf v. Scarnati*, 233 A.3d 679, 684 (Pa. 2020). Instead, we decide herein only the narrow legal question of whether the Acting Secretary acted properly in issuing the Masking Order in the absence of either legislative oversight or a declaration of disaster emergency by the Governor.[3]

Upon review, we grant Petitioners' Application and deny Respondent's Application.

## I. *Background and Procedural Posture*

---

[3] The parties stipulated that this matter could be decided on the purely legal issues of (1) whether the Masking Order constitutes a rule or regulation subject to the provisions of the Regulatory Review Act, Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-745.15 (Regulatory Review Act), and (2) whether the Masking Order violates the principles governing the delegation of legislative authority. *See* Commonwealth Court Order dated September 13, 2021 (September 13 Order) at 2. While the Dissenting Opinion raises issues of the substantive merit of the Masking Order, *see* Dissenting Opinion at 11-12, that issue is not before this Court. This Majority Opinion intentionally does not respond to points raised by the Dissenting Opinion, on the merits or otherwise, beyond the scope of those stipulated by the parties for consideration by this Court.

On March 6, 2020, Governor Wolf issued a Proclamation of Disaster Emergency (Disaster Proclamation) pursuant to Section 7301(c) of the Emergency Management Services Code (Emergency Code),[4] 35 Pa.C.S. § 7301(c),[5] regarding the novel coronavirus (COVID-19) pandemic.[6] Thereafter, the Governor implemented numerous orders designed to mitigate and stop the spread of COVID-19, which orders, *inter alia*, closed restaurants and bars in Pennsylvania for in-person dining, closed non-essential businesses, limited the size of in-person gatherings within the Commonwealth, and directed citizens to stay at home. Governor Wolf also issued multiple periodic amendments to the Disaster

---

[4] 35 Pa.C.S. §§ 7101-79A33.

[5] At the time Governor Wolf issued the Disaster Proclamation, Section 7301 of the Emergency Code allowed for the issuance of disaster emergency declarations that would continue at the discretion of the Governor for renewable 90-day periods terminable by the General Assembly as follows:

> **Declaration of disaster emergency.**--A disaster emergency shall be declared by executive order or proclamation of the Governor upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent. The state of disaster emergency shall continue until the Governor finds that the threat or danger has passed or the disaster has been dealt with to the extent that emergency conditions no longer exist and terminates the state of disaster emergency by executive order or proclamation, but no state of disaster emergency may continue for longer than 90 days unless renewed by the Governor. The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time.

35 Pa.C.S. § 7301(c). As discussed *infra*, the enactment of two amendments to Pennsylvania's Constitution in May of 2021 limited the duration of a gubernatorial disaster emergency declaration pursuant to this section of the Emergency Code.

[6] At the time the Governor issued the Disaster Proclamation, the World Health Organization (WHO) characterized the COVID-19 outbreak as a "public health emergency of international concern." *See* Disaster Proclamation at 1 (pagination supplied). The WHO upgraded the COVID-19 outbreak to a global pandemic shortly thereafter on March 11, 2020.

Proclamation, each of which renewed the Disaster Proclamation for an additional 90 days.[7]

On May 18, 2021, the voters of the Commonwealth approved two amendments to the Pennsylvania Constitution that limit the Governor's power under the Emergency Code (collectively, the Constitutional Amendments).[8] The first of the Constitutional Amendments amended section 9 of article III of the Constitution to allow the General Assembly, by a simple majority vote, to extend or terminate a gubernatorial disaster emergency declaration, or a portion thereof, as declared by an executive order or proclamation. *See* Pa. Const. art. III, § 9.[9] The second of the Constitutional Amendments added new section 20 to article IV of the Pennsylvania Constitution, which section limits the duration of a gubernatorial disaster emergency

---

[7] The Governor issued amendments renewing the Disaster Proclamation on June 3, 2020, August 31, 2020, November 24, 2020, February 19, 2021, and May 20, 2021.

[8] The Constitutional Amendments followed our Supreme Court's July 1, 2020 decision in *Wolf v. Scarnati*, 233 A.3d 679 (Pa. 2020), wherein the Supreme Court held that the General Assembly could not unilaterally terminate a Governor's emergency powers by resolution. *See generally Scarnati*.

[9] Section 9 of article III of the Pennsylvania Constitution now provides as follows:

> Every order, resolution or vote, to which the concurrence of both Houses may be necessary, except on the questions of adjournment or termination or extension of a disaster emergency declaration as declared by an executive order or proclamation, or portion of a disaster emergency declaration as declared by an executive order or proclamation, shall be presented to the Governor and before it shall take effect be approved by him, or being disapproved, shall be repassed by two-thirds of both Houses according to the rules and limitations prescribed in case of a bill.

Pa. Const. art. III, § 9.

declaration to 21 days absent an extension by concurrent resolution of the General Assembly. *See* Pa. Const. art. IV, § 20.[10]

Following the adoption of the Constitutional Amendments, on June 10, 2021, the General Assembly approved a concurrent resolution terminating the Disaster Proclamation (Concurrent Resolution). Governor Wolf did not issue a new proclamation of disaster emergency following the approval of the Concurrent Resolution.

---

[10] Section 20 of article IV of the Pennsylvania Constitution provides:

**§ 20. Disaster emergency declaration and management**

(a) A disaster emergency declaration may be declared by executive order or proclamation of the Governor upon finding that a disaster has occurred or that the occurrence or threat of a disaster is imminent that threatens the health, safety or welfare of this Commonwealth.

(b) Each disaster emergency declaration issued by the Governor under subsection (a) shall indicate the nature, each area threatened and the conditions of the disaster, including whether the disaster is a natural disaster, military emergency, public health emergency, technological disaster or other general emergency, as defined by statute. The General Assembly shall, by statute, provide for the manner in which each type of disaster enumerated under this subsection shall be managed.

(c) A disaster emergency declaration under subsection (a) shall be in effect for no more than twenty-one (21) days, unless otherwise extended in whole or part by concurrent resolution of the General Assembly.

(d) Upon the expiration of a disaster emergency declaration under subsection (a), the Governor may not issue a new disaster emergency declaration based upon the same or substantially similar facts and circumstances without the passage of a concurrent resolution of the General Assembly expressly approving the new disaster emergency declaration.

Pa. Const. art. IV, § 20.

However, on August 31, 2021, in anticipation of a Commonwealth-wide return to in-person learning in the 2021-2022 school year, the Acting Secretary issued the Masking Order, effective September 7, 2021. Initially, the Masking Order provides an introductory statement that explains the Acting Secretary imposed the Masking Order to protect the health and safety of Pennsylvania's schoolchildren.[11] *See* Masking Order at 1-3. The introductory statement outlines the Acting Secretary's purported authority to impose the Masking Order as follows:

> COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures. This authority is granted to the Secretary of Health pursuant to Pennsylvania law. *See* [S]ection 5 of the Disease Prevention and Control Law[, Act of April 23, 1956, P.L. (1955) 1510 (Disease Control Law)], 35 P.S. § 521.5; [S]ection 2102(a) of The Administrative Code of 1929, 71 P.S. § 532(a); and the Department of Health's regulation at 28 Pa. Code § 27.60 (relating to disease control measures). Particularly, the Department of Health [] has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* 35 P.S. § 521.5; 71 P.S. §§ 532(a), and [Section 8 of the Act of April 27, 1905, P.L. 312, *as amended*, 71 P.S. §] 1403(a); 28 Pa. Code § 27.60.

---

[11] The Masking Order breaks this generalized reason into multiple sub-reasons: (1) the rising risk of COVID-19 to unvaccinated individuals based on the increased transmissibility and severity of the Delta variant of the SARS-CoV-2 virus; (2) the current unavailability of an approved vaccine for many school-aged children; (3) the desire to maintain in-person instruction and socialization, which are necessary for the health and wellbeing of children; (4) the strong recommendation issued by the Centers for Disease Control and Prevention for masking of all persons within the nation's schools regardless of vaccination status; (5) the recommendation of the American Academy of Pediatrics that masks be worn in schools; (6) studies indicating that mask-wearing in schools contributes to lower levels of COVID-19 transmission among students and staff; and (7) rising COVID-19 case counts and hospitalizations. *See* Masking Order at 1-3.

Masking Order at 3.  Section 2 of the Masking Order contains a "General Masking Requirement" that requires:

> Each teacher, child/student, staff, or visitor working, attending, or visiting a School Entity[12] shall wear a face covering indoors, regardless of vaccination status, except as set forth in Section 3.[13]

[12] The Masking Order defines a "School Entity" as any of the following:

> (1) A public PreK-12 school.
> (2) A brick and mortar or cyber charter school.
> (3) A private or parochial school.
> (4) A career and technical center (CTC).
> (5) An Intermediate unit (IU).
> (6) A PA Pre-K Counts program, Head Start Program, Preschool Early Intervention program, or Family Center.
> (7) A private academic nursery school and locally-funded prekindergarten activities.
> (8) A childcare provider licensed by the Department of Human Services of the Commonwealth.

Masking Order at 3-4.

[13] Section 3 of the Masking Order enumerates the exceptions to the masking requirement and provides:

> The following are exceptions to the face covering requirements in Section 2.  All alternatives to a face covering, including the use of a face shield, should be exhausted before an individual is excepted from this Order.
>
> A.     If wearing a face covering while working would create an unsafe condition in which to operate equipment or execute a task as determined by local, state, or federal regulators or workplace safety guidelines.
>
> B.     If wearing a face covering would either cause a medical condition, or exacerbate an existing one, including respiratory issues that impede breathing, a mental health condition or a disability.
>
> C.     When necessary to confirm the individual's identity.

8

Masking Order at 4. Regarding the duration of the Masking Order, Section 6 indicates that, once effective, the Masking Order "shall remain in effect until otherwise terminated." Masking Order at 6.

On September 3, 2021, Petitioners filed a Petition for Review, in which Petitioners allege the Acting Secretary failed to comply with the requirements of the Disease Control Law in issuing the Masking Order, and "Petitioners' Application for Special Relief in the Form of an Emergency Preliminary Injunction Under Pa.R.A.P. 1532" (Application for Special Relief), which sought an injunction to

---

D. When working alone and isolated from interaction with other people with little or no expectation of in-person interaction.

E. If an individual is communicating or seeking to communicate with someone who is hearing-impaired or has another disability, where the ability to see the mouth is essential for communication.

F. When the individual is under two (2) years of age.

G. When an individual is:

1) Engaged in an activity that cannot be performed while wearing a mask, such as eating and drinking, or playing an instrument that would be obstructed by the face covering; or

2) Participating in high intensity aerobic or anerobic activities, including during a physical education class in a well-ventilated location and able to maintain a physical distance of six feet from all other individuals.

H. When a child/student is participating in a sports practice activity or event, whether indoors or outdoors.

Masking Order at 4-5.

9

prevent the Acting Secretary from enforcing the Masking Order. The Acting Secretary filed Respondent's Answer to Petitioners' Application for Special Relief in the Form of an Emergency Preliminary Injunction on September 8, 2021, and the matter was scheduled for a hearing on September 16, 2021.

Following a pre-hearing conference conducted on September 13, 2021, on agreement of the parties, the Court stayed the hearing on the Application for Special Relief[14] and directed the parties to file briefs addressing the limited legal issues of (1) whether the Masking Order constitutes a rule or regulation subject to the provisions of the Regulatory Review Act, Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§ 745.1-745.15 (Regulatory Review Act), and (2) whether the Masking Order violates the principles governing the delegation of legislative authority. *See* Commonwealth Court Order dated September 13, 2021 (September 13 Order) at 2. Thereafter, Petitioners and Respondent each timely filed a brief pursuant to the September 13 Order on September 16, 2021, and September 23, 2021, respectively. Following a status conference conducted on September 27, 2021, Petitioners withdrew the Application for Special Relief and the parties filed their respective applications for summary relief and responses thereto. This Court

---

[14] The Court also held in abeyance Respondent's "Application for Relief in the Nature of a Motion to Quash Notice to Attend and Subpoena *Ad Testificandum* Directed to Alison M. Beam, Acting Secretary of Health," which sought to quash the subpoena issued to compel the testimony of the Acting Secretary at the scheduled hearing on the Application for Special Relief. *See* Commonwealth Court Order dated September 13, 2021, at 2.

conducted *en banc* argument on October 20, 2021. The parties' applications for summary relief are now ripe for determination by the Court.[15, 16]

## II. *Discussion*

The applications for summary relief[17] currently before the Court argue diametrically opposed views of the same undisputed facts, stated *supra*, regarding

---

[15] Amicus Curiae briefs were filed by the Spring Grove Area School District, Central York School District and Penn-Trafford School District.

[16] On October 27, 2021, the Acting Secretary also filed "Respondents' [sic] Application for Relief in the Nature of a Motion for Leave to Supplement the Record" in this matter (Application to Supplement Record), seeking to add the Joint Committee on Documents' October 21, 2021, Order in Favor of Respondent Department of Health (Joint Committee Order) to the record of this matter. *See* Application to Supplement Record. This Application to Supplement the Record was treated as an application pursuant to Rule of Appellate Procedure 2501(a) and was granted on October 29, 2021, as a post-submission communication to the Court advising the Court of the Joint Committee Order. *See* Pa.R.A.P. 2501(a).

[17] Pennsylvania Rule of Appellate Procedure 1532(b) provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b); *see also Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 195 (Pa. Cmwlth. 2015). In deciding a request for summary relief, "this [C]ourt must determine whether it is clear from the undisputed facts that either party has a clear right to the relief requested." *Bell Atl.-Pa., Inc. v. Tpk. Comm'n*, 703 A.2d 589, 590 (Pa. Cmwlth. 1997), *aff'd*, 713 A.2d 96 (Pa. 1998). "The record, for purposes of the motion for summary relief, is the same as a record for purposes of a motion for summary judgment." *Summit*, 108 A.3d at 195-96. Pursuant to Pennsylvania Rule of Civil Procedure 1035.1, the record in a motion for summary judgment includes any: "(1) pleadings, (2) depositions, answers to interrogatories, admissions and affidavits, and (3) reports signed by an expert witness that would, if filed, comply with [Pa.R.Civ.P. 4003.5(a)(1)], whether or not the reports have been produced in response to interrogatories." Pa.R.Civ.P. 1035.1. "In ruling on applications for summary relief, [this Court] must view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there is no genuine issue as to any material facts and the right to judgment is clear as a matter of law." *Eleven Eleven Pa., LLC v. State Bd. of Cosmetology*, 169 A.3d 141, 145 (Pa. Cmwlth. 2017) (internal brackets omitted).

11

the imposition of the Masking Order, with each party claiming that these undisputed facts entitle them to summary relief. Petitioners argue that, because the Acting Secretary imposed the Masking Order without statutory authority, the Masking Order, which does not rely on a gubernatorial declaration of disaster emergency, represents a rule or regulation issued without compliance with established, statutory rulemaking requirements and is accordingly void *ab initio*. *See generally* Petitioners' Application; Petitioners' Br. Respondent, on the other hand, argues that the Masking Order is not a rule or regulation subject to regulatory rulemaking procedures, but instead was promulgated pursuant to existing statutory and regulatory authority. *See generally* Respondent's Application; Respondent's Br.

Initially, we begin by reviewing the established law governing the process for the promulgation of regulations by Commonwealth agencies. As this Court has explained:

> An agency derives its power to promulgate regulations from its enabling act. An agency's regulations are valid and binding only if they are: (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable. . . . [W]hen promulgating a regulation, an agency must comply with the requirements set forth in the Commonwealth Documents Law[, Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602, and 45 Pa.C.S. §§ 501-907, which, collectively, are known as the "Commonwealth Documents Law"], the Commonwealth Attorneys Act[, Act of October 15, 1980, P.L. 950, *as amended,* 71 P.S. §§ 732-101-732-506,] and the Regulatory Review Act. Regulations promulgated in accordance with these requirements have the force and

12

effect of law. A regulation not promulgated in accordance with the statutory requirements will be declared a nullity.

In general, the purpose of the Commonwealth Documents Law is to promote public participation in the promulgation of a regulation. To that end, an agency must invite, accept, review and consider written comments from the public regarding the proposed regulation; it may hold public hearings if appropriate. [Section 202 of the Commonwealth Documents Law,] 45 P.S. § 1202. After an agency obtains the Attorney General's approval of the form and legality of the proposed regulation, the agency must deposit the text of the regulation with the Legislative Reference Bureau for publication in the *Pennsylvania Bulletin.* Section 205, 207 of the Commonwealth Documents Law, 45 P.S. §§ 1205, 1207.

The legislature has identified what is meant by an "agency" for purposes of the Commonwealth Documents Law. It has defined an "agency" as:

> the Governor or any department, departmental administrative board or commission, officer, independent board or commission, authority or other agency of this Commonwealth now in existence or hereafter created. . . .

Section 102(3) of the Commonwealth Documents Law, 45 P.S. § 1102(3) []. Thus, any "independent commission" or any "other agency of this Commonwealth," including one not in existence at the time of the enactment of the Commonwealth Documents Law, is subject to its terms.

*Germantown Cab Co. v. Phila. Parking Auth.*, 993 A.2d 933, 937-38 (Pa. Cmwlth. 2010), *aff'd*, 36 A.3d 105 (Pa. 2012) (footnotes, internal quotations, emphasis, and some internal citations omitted).

Additionally, the Regulatory Review Act establishes a "mandatory, formal rulemaking procedure[18] that is, with rare exceptions, required for the promulgation of [agency] regulations." *See Naylor v. Dep't of Pub. Welfare*, 54 A.3d 429, 433 (Pa. Cmwlth. 2012), *aff'd*, 76 A.3d 536 (Pa. 2013); *see also* Section 5 of the Regulatory Review Act, 71 P.S. § 745.5. The General Assembly enacted the Regulatory Review Act with the express purpose of establishing procedures "for oversight and review of regulations adopted pursuant to this delegation of legislative power in order to curtail excessive regulation and to require the executive branch to justify its exercise of the authority to regulate[.]" 71 P.S. § 745.5.[19] Accordingly,

---

[18] In promulgating regulations, the Regulatory Review Act requires that Commonwealth agencies "submit [] proposed regulation[s] to [the Independent Regulatory Review Commission (IRRC)] for public comment, recommendation from [the] IRRC, and, ultimately, [the] IRRC's approval or denial of a final-form regulation. [Section 5 of the Regulatory Review Act,] 71 P.S. § 745.5." *Naylor v. Dep't of Pub. Welfare*, 54 A.3d 429, 434 (Pa. Cmwlth. 2012), *aff'd*, 76 A.3d 536 (Pa. 2013).

> For thirty days thereafter, interested members of the public or relevant legislative committees may submit public comments. At the close of the public comment period, [the] IRRC may offer recommendations on the proposed regulation. The agency then reviews and considers the comments and delivers final-form regulations to [the] IRRC.
>
> [The] IRRC may then approve or disapprove the regulations within thirty (30) days. In making a decision, [the] IRRC considers, in part, whether the agency has the statutory authority to promulgate the legislation.

*Naylor*, 54 A.3d at 434 n.10 (internal citations omitted).

[19] The General Assembly explained its intent in enacting the Regulatory Review Act in depth as follows:

> The General Assembly has enacted a large number of statutes and has conferred on boards, commissions, departments and agencies within the executive branch of government the authority to adopt rules and regulations to implement those statutes. The General

14

in the absence of a gubernatorial proclamation of disaster emergency or a statute or regulation that authorizes or requires a new agency rule or requirement, the enactment of new rules and regulations proposed by Commonwealth agencies must be accomplished in compliance with the mandatory procedures for review set forth in the Regulatory Review Act.[20]  *See* 71 P.S. § 745.5.  Our Supreme Court, however,

Assembly has found that this delegation of its authority has resulted in regulations being promulgated without undergoing effective review concerning cost benefits, duplication, inflationary impact and conformity to legislative intent.  The General Assembly finds that it must establish a procedure for oversight and review of regulations adopted pursuant to this delegation of legislative power in order to curtail excessive regulation and to require the executive branch to justify its exercise of the authority to regulate before imposing hidden costs upon the economy of Pennsylvania.  It is the intent of this act to establish a method for ongoing and effective legislative review and oversight in order to foster executive branch accountability; to provide for primary review by a commission with sufficient authority, expertise, independence and time to perform that function; to provide ultimate review of regulations by the General Assembly; and to assist the Governor, the Attorney General and the General Assembly in their supervisory and oversight functions.  To the greatest extent possible, this act is intended to encourage the resolution of objections to a regulation and the reaching of a consensus among the commission, the standing committees, interested parties and the agency.

Section 2(a) of the Regulatory Review Act, 71 P.S. § 745.2(a).

[20] We note that procedures exist to expedite the administrative rulemaking process, if necessary.  Section 6(d) of the Regulatory Review Act authorizes the Governor to certify the immediate adoption of regulations "to meet an emergency which includes conditions which may threaten the public health, safety or welfare[.]"  71 P.S. § 745.6(d).  This certification bars the IRRC from issuing an order barring an agency from "promulgating a final-form or final omitted regulation" and allows the regulation to "take effect on the date of publication," while its review by the IRRC and the House and Senate Committees takes place over a 120-day period.  *Id.*  The emergency regulation "shall be rescinded after 120 days or upon final disapproval, whichever occurs later."  *Id.*  If no action is taken by the expiration of the review period, the regulation shall continue in full force and effect until otherwise suspended or repealed.  *See id.*

15

has recognized that the Governor may, as a valid use of police power, suspend the otherwise mandatory rulemaking procedures of the Regulatory Review Act upon the declaration or proclamation of a disaster emergency pursuant to the Emergency Code, 35 Pa.C.S. § 7301(c). *See Scarnati*, 233 A.3d at 705; *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 887-88, 892-93 (Pa.), *cert. denied*, 141 S. Ct. 239 (2020).[21]

In the instant matter, it is undisputed that the Governor did not issue a new declaration of disaster emergency following the termination of the Disaster Proclamation by the General Assembly's June 10, 2021 Concurrent Resolution. It is likewise beyond dispute that the Acting Secretary did not comply with the formal requirements of the Commonwealth Documents Law and the Regulatory Review Act in promulgating the Masking Order. As a result, the pertinent question herein is whether the Masking Order represents a rule or regulation subject to the formal requirements for regulatory rulemaking and, if so, whether the Acting Secretary was authorized by statute or regulation to promulgate the Masking Order without

---

Although the Regulatory Review Act has been amended numerous times since its enactment in 1982, the mechanism for the emergency certification of agency regulations has remained intact. Under this mechanism, a regulation can be promulgated expeditiously. For example, on March 17, 1986, in the wake of "substantial increase in the number of mid-term cancellations and nonrenewal of commercial property and casualty insurance policies," Governor Dick Thornburgh certified that emergency rulemaking was required to address that "emergency situation." 16 PA. B. 953 (Mar. 22, 1986) (citations omitted). On March 22, 1986, the Insurance Department published its "emergency amendments" to its regulations "to provide commercial property and casualty insurance policyholders within 60 days' advance notice of nonrenewal or midterm cancellation of their coverage and to limit the reasons for which an insurer may cancel commercial property and casualty insurance policies in midterm." 16 PA. B. 951-52 (Mar. 22, 1986). The regulation was deemed approved by the IRRC on April 16, 1986. *See* 16 PA. B. 4167 (Oct. 25, 1986). From the certification of the emergency to the promulgation of the emergency regulation, a total of five days elapsed. In the instant matter, the Acting Secretary did not employ such measures in the implementation of the Masking Order.

[21] The Acting Secretary notes that this Court followed these Supreme Court holdings in its unpublished opinion *County of Allegheny v. Cracked Egg, LLC* (Pa. Cmwlth., No. 101 C.D. 2021, filed July 23, 2021), slip op. at 30-33.

16

complying with the formal requirements of the Commonwealth Documents Law and the Regulatory Review Act.

> As our Supreme Court has observed:
>
> > An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

*Pa. Hum. Rels. Comm'n v. Norristown Area Sch. Dist.*, 374 A.2d 671, 679 (Pa. 1977). Therefore, as opposed to regulations that establish substantive rules, the promulgation of simple statements of policy does not require adherence to the procedural requirements of the Regulatory Review Act. *See id.* On the distinction between these concepts, our Supreme Court has noted:

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. . . . A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.
>
> A general statement of policy, on the other hand, does not establish a "binding norm". . . . A policy statement

17

announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Id.*

Because the Masking Order herein is intended to, and actually does, dictate citizens' standards of conduct within Pennsylvania's schools, we need not belabor an analysis of whether the Masking Order represents simply a general statement of policy as opposed to a regulation. The language of the Masking Order clearly mandates that those inside School Entities must wear masks and binds those School Entities and those attending or visiting. The Order does not guide or provide an interpretation of a statute, but rather, requires that "[e]ach teacher, child/student, staff, or visitor working, attending, or visiting a School Entity shall wear a face covering indoors, regardless of vaccination status[.]" Masking Order at 4. There is no palatable argument that this Order is mere guidance.[22]

The Regulatory Review Act defines a "regulation," in relevant part, as:

[22] We acknowledge the Dissenting Opinion's citation of dicta in *Northwestern Youth Services. Inc. v. Department of Public Welfare*, 66 A.3d 301 (Pa. 2013), in an attempt to classify the Masking Order as an "interpretative" rule. *See Corman v. Acting Sec'y of the Pa. Dep't of Health*, __ A.3d __ (Pa. Cmwlth. 2021) (Wojcik, J., dissenting), slip op. at 9-11. There are two categories of rules: (1) legislative, and (2) non-legislative, sometimes called "guidance documents" or "interpretive rules," that merely explain existing statutes or regulations. *Nw. Youth Servs.*, 66 A.3d at 310-11. The Supreme Court in *Northwestern Youth Services* held that a bulletin intended to be "mandatory and binding" was neither a "guideline" nor a "statement of the Department's future intent," but rather, imposed new and strict changes to an agency's practices and policies and was procedurally invalid where regulatory review procedures were not followed. *Id*. at 307 & 316-17. This holding supports the conclusion that the Masking Order, a mandate, is procedurally invalid as it did not follow regulatory review procedures and does not support the Dissenting Opinion's position that the Masking Order is an interpretive rule not subject to those procedures.

Further, the Dissenting Opinion overlooks the fact that, in the instant matter, the Acting Secretary does not contend that her Masking Order is mere guidance or an interpretation of any rule or regulation. *See* Masking Order at 3; *see also Nw. Youth Servs.*, 66 A.3d at 311-12.

18

[a]ny rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency or amending, revising or otherwise altering the terms and provisions of an existing regulation, or prescribing the practice or procedure before such agency. . . . The term shall not include a proclamation, executive order, directive or similar document issued by the Governor, but shall include a regulation which may be promulgated by an agency, only with the approval of the Governor.

Section 3 of the Regulatory Review Act, 71 P.S. § 745.3. Our Supreme Court has adopted the three-part "binding norm" test articulated by the Court of Appeals for the District of Columbia to determine whether an order issued by an agency amounts to a regulation requiring adherence to formal rulemaking processes. *See Pa. Hum. Rels. Comm'n*, 374 A.2d at 679. Pursuant to this test,

[i]n ascertaining whether an agency has established a binding norm, the reviewing court must consider: (1) the plain language of the provision; (2) the manner in which the agency has implemented the provision; and, (3) whether the agency's discretion is restricted by the provision.

*Eastwood Nursing & Rehab. Ctr. v. Dep't of Pub. Welfare*, 910 A.2d 134, 144 (Pa. Cmwlth. 2006).

Here, with certain exceptions, the plain language of the Masking Order requires all persons physically within a School Entity as a student, teacher, staff, or visitor, to wear a face covering regardless of COVID-19 infection or vaccination status. This plain language clearly indicates that the Masking Order is an order of general application that creates a binding norm for all persons physically within

19

School Entities. Further, the Acting Secretary intended the Masking Order to be implemented not by future rulemaking, but immediately upon the effective date and under the authority of statute and regulation as cited in the Masking Order itself. Finally, the Masking Order leaves no room for the Department of Health to exercise any discretion regarding compliance with the Masking Order, once implemented. The Masking Order is a blanket rule that affects all School Entities in the Commonwealth. The Masking Order has the force and effect of law.

In consideration of the above, we have little difficulty agreeing that the Masking Order represents an attempt by the Acting Secretary to impose a new, binding norm. As such, if not already authorized by statute or regulation, and in the absence of a disaster emergency declared by the Governor, the Masking Order represents a regulation subject to the requirements of the Commonwealth Documents Law and the Regulatory Review Act.[23]

---

[23] We note that the Regulatory Review Act contains a document classification procedure whereby a legislative committee may review a document and, if it determines the document should be published as a regulation, the committee may present the matter to the Joint Committee on Documents. *See* Section 7.1 of the Regulatory Review Act, added by the Act of June 30, 1989, P.L. 73, 71 P.S. § 745.7a. The Joint Committee on Documents consists of nine governmental members – the General Counsel, the Attorney General, the Director of the Legislative Reference Bureau, the Director of the Pennsylvania Code, the President Pro Tempore of the Senate, the Minority Leader of the Senate, the Speaker of the House of Representatives, the Minority Leader of the House of Representatives, and the Secretary of General Services, or persons designated by each – and two public members appointed by the Governor from among attorneys at law or other members of the public who represent the class of persons who may be expected to be effected by documents published by the Joint Committee on Documents. *See* 45 Pa.C.S. § 502. Pursuant to this procedure, once the legislative committee determines that a document should be published as a regulation and presents it to the Joint Committee on Documents, the Joint Committee then makes its own determination of whether the document should be promulgated as a regulation. *See* Section 7.1 of the Regulatory Review Act, 71 P.S. § 745.7a.

This process occurred in the instant matter. On September 14, 2021, the Pennsylvania House of Representatives Health Committee concluded that the Masking Order is, in fact, a rule or regulation requiring compliance with the Regulatory Review Act and presented this determination, by letter, to the Joint Committee on Documents. *See* Letter to the Commonwealth

The Acting Secretary claims that the Masking Order is not a rule or regulation requiring compliance with the requirements of the Commonwealth Documents Law or the Regulatory Review Act, but instead is an order promulgated pursuant to the authority granted to the Secretary of Health by Pennsylvania law, specifically, Section 5 of the Disease Control Law, 35 P.S. § 521.5, Section 2102(a) of the Administrative Code, 71 P.S. §§ 532(a), Section 8 of the Act of April 27, 1905, P.L. 312, 71 P.S. § 1403(a), and the Department of Health's regulation at 28 Pa. Code § 27.60 (relating to disease control measures). The Masking Order states that these authorities allow the Department to implement *any* disease control measure appropriate to protect the public from the spread of infectious disease. *See* Masking Order at 3. We do not agree.

Before reviewing the authority cited by the Acting Secretary for the implementation of the Masking Order, we observe the following with reference to the principle of administrative agency deference:

> Courts give substantial deference to an agency's interpretation of a statute the agency is charged with implementing and enforcing. An administrative agency's interpretation of the statute it is charged to administer is entitled to deference on appellate review absent fraud, bad faith, abuse of discretion or clearly arbitrary action. Interpretations of an ordinance that are entitled to deference become of controlling weight unless they are

Joint Committee on Documents from Kathy L. Rapp, Chairperson of the House of Representatives Health Committee, dated September 14, 2021, attached as Exhibit G to Petitioners' Application. Thereafter, on October 21, 2021, the Joint Committee on Documents reviewed the Masking Order and arrived, by a vote of 7 to 4, at the opposite conclusion – that the Masking Order was not a regulation requiring compliance with formal rulemaking procedures. *See* Joint Committee Order. The Joint Committee Order, which has been appealed at Commonwealth Court Docket No. 1184 C.D. 2021, was issued absent analysis or rationale and, in any case, has no precedential or binding effect on the judiciary. *See The Honorable Kathy L. Rapp, Chair, on behalf of the House of Representatives Health Comm. v. Dep't of Health* (Pa. Cmwlth., No. 1184 C.D. 2021).

plainly erroneous or inconsistent with the ordinance. However, when an administrative agency's interpretation is inconsistent with the statute itself, or when the statute is unambiguous, such administrative interpretation carries little weight.

*Azoulay v. Phila. Zoning Bd. of Adjustment*, 194 A.3d 241, 249 (Pa. Cmwlth. 2018) (internal quotations, citations, and brackets omitted). Initially, and as discussed hereinafter, we find the text of the statutes and regulations cited by the Acting Secretary as authorizing the implementation of the Masking Order to be unambiguous. For this reason, we owe no deference to the Department of Health's interpretation thereof. *Id.* at 249.

Regarding the specific sections of Pennsylvania law upon which the Acting Secretary bases her authority to implement the Masking Order, first, Section 5 of the Disease Control Law, entitled "Control measures," provides that

> [u]pon the receipt by a local board or department of health or by the [D]epartment [of Health], as the case may be, of a report of a disease which is subject to isolation, quarantine, or any other control measure, the local board or department of health or the [D]epartment [of Health] shall carry out the appropriate control measures *in such manner and in such place as is provided by rule or regulation*.

35 P.S. § 521.5 (emphasis added). A "control measure" is limited to one as provided by an existing rule or regulation. *See id.*

The Masking Order requires neither isolation[24] nor quarantines.[25] Therefore, the Acting Secretary by necessity relies on the "any other control measure" portion of this section of the Disease Control Law as authority for the Masking Order. However, the language of this section – particularly "a disease which is subject to isolation, quarantine, or any other disease control measure" and "shall carry out the appropriate control measures" – contemplates existing control measures for diseases already subject to those existing control measures. Additionally, the Acting Secretary's reading of Section 5 of the Disease Control Law does not account for the portion of the text that immediately follows the "any control measures" language that requires that any "other control measure" be carried out "in such manner and in such place as is provided by an existing rule or regulation." 35 P.S. § 521.5. As a result of this express limitation, while Section 5 of the Disease Control Law does grant the authority to "carry out the appropriate control measures"

---

[24] The Disease Control Law defines "isolation" as:

> The separation for the period of communicability of infected persons or animals from other persons or animals in such places and under such conditions as will prevent the direct or indirect transmission of the infectious agent from infected persons or animals to other persons or animals who are susceptible or who may spread the disease to others.

Section 2 of the Disease Control Law, 35 P.S. § 521.2.

[25] The Disease Control Law defines "quarantine" as:

> The limitation of freedom of movement of persons or animals who have been exposed to a communicable disease for a period of time equal to the longest usual incubation period of the disease in such manner as to prevent effective contact with those not so exposed. Quarantine may be complete, or, as defined below, it may be modified, or it may consist merely of surveillance or segregation.

Section 2 of the Disease Control Law, 35 P.S. § 521.2.

to control diseases, as Respondent suggests,[26] it does not provide the Acting Secretary with the blanket authority to create new rules and regulations out of whole cloth, provided they are related in some way to the control of disease or can otherwise be characterized as disease control measures.[27] Instead, Section 5 limits the "other control measures" available to Respondent to those permitted under existing rules and regulations. Accordingly, this section of the Disease Control Law does not, on its own, provide the Acting Secretary with the authority to impose the Masking Order's non-isolation, non-quarantine control measure of requiring all individuals to wear masks or face coverings inside Pennsylvania's School Entities to combat reports of COVID-19.

The Acting Secretary also relies on two provisions from the Administrative Code as further authority for the implementation of the Masking Order. *See* Masking Order at 3. Section 2102(a) of the Administrative Code, entitled "General health administration," enumerates the duties of the Department of Health, among which are the duties

> [t]o protect the health of the people of this Commonwealth, and to determine and employ the most efficient and practical means for the prevention and suppression of disease[.]

71 P.S. § 532(a). The Administrative Code further states, in the section entitled "Duty to protect health of the people," that

---

[26] *See* Respondent's Brief Addressing Legal Issues Framed In the Court's September 13, 2021 Order at 4.

[27] Respondent acknowledges that, while the General Assembly may delegate broad powers to the executive branch of government, it may not impart limitless discretion thereon. *See* Respondent's Br. at 20.

> [i]t shall be the duty of the Department of Health to protect the health of the people of the State, and to determine and employ the most efficient and practical means for the prevention and suppression of disease.

Section 8 of the Act of April 27, 1905, P.L. 312, 71 P.S. § 1403(a). These sections are statements of general duties of the Department of Health. By so listing these duties, these subsections do authorize the Department of Health to promulgate rules and regulations to accomplish these goals and fulfill these duties, but do not authorize specific means by which the Department of Health may accomplish the duties, nor do they provide specific authority for the Masking Order. These Administrative Code subsections make no reference whatsoever to disease control measures of any kind; nothing in these subsections authorizes the promulgation of rules or regulations pursuant to the duties listed therein without compliance with established rulemaking protocols. It goes without saying that the Department of Health must carry out these duties within the constraints of the law and does not have carte blanche authority to impose whatever disease control measures the Department of Health sees fit to implement without regard for the procedures for promulgating rules and regulations, expedited or otherwise. *See supra* nn.18-20.

The Acting Secretary also cites Section 27.60 of the Department of Health Regulations, 28 Pa. Code § 27.60, as authorizing the requirements of the Masking Order. Section 27.60(a) provides that

> [t]he Department [of Health] or local health authority shall direct isolation of a person or an animal *with a communicable disease or infection*; surveillance, segregation, quarantine or modified quarantine of contacts of a person or an animal *with a communicable disease or infection*; and any other disease control measure the

25

Department [of Health] or the local health authority considers to be *appropriate for the surveillance of disease*, when the disease control measure is necessary to protect the public from the spread of infectious agents.

28 Pa. Code § 27.60(a)[28] (emphasis added).[29]  This subsection of Department of Health Regulation Section 27.60 speaks in terms of isolating[30] and/or surveilling[31] animals or individuals with a communicable disease or infection, and also in terms of the surveillance, segregation, and quarantine of contacts[32] of a person or an animal

---

[28] The directives authorized by Section 27.60 are issued to discrete individuals with a communicable disease and their contacts.  In that regard, the directive is a quasi-judicial action governed by the Administrative Agency Law, 2 Pa.C.S. §§ 101-754.  An agency action with "general application throughout the Commonwealth is a quasi-legislative function and is not an adjudication." 20 Darlington et al., WEST'S PENNSYLVANIA APPELLATE PRACTICE § 102:6 (2020).  Calling a regulation an "order" does not diminish the quasi-legislative character of the agency action. *See Sule v. Phila. Parking Auth.*, 26 A.3d 1240, 1244 (Pa. Cmwlth. 2011).

[29] We note that, in reciting the provisions of Section 27.60(a) of the Department of Health Regulations, the Dissenting Opinion omits the portion of text that makes clear that Section 26.70(a) refers to control measures considered "appropriate for the surveillance of disease[.]" *See* 28 Pa. Code § 26.70(a); *see also Corman*, __ A.3d at __ (Wojcik, J., dissenting), slip op. at 11.

[30] The Department of Health's regulations define "isolation" to mean:

> The separation for the communicable period of an infected person or animal from other persons or animals, in such a manner as to prevent the direct or indirect transmission of the infectious agent from infected persons or animals to other persons or animals who are susceptible or who may spread the disease to others.

28 Pa. Code § 27.1.

[31] The Department of Health's regulations define "surveillance of disease" to mean:

> The continuing scrutiny of all aspects of occurrence and spread of disease that are pertinent to effective control.

28 Pa. Code § 27.1.

[32] The Department of Health's regulations define "contact" to mean:

with a communicable disease or infection. *See id.* The Masking Order requires the wearing of masks and/or face coverings in School Entities regardless of whether individuals are known to be infected with COVID-19 or whether they are a contact of an individual known to be infected with a communicable disease. As such, the Masking Order cannot be said to be in furtherance of the isolation or surveillance of animals or individuals with a communicable disease or the surveillance, segregation, or quarantine of contacts of a person or an animal with a communicable disease or infection.

To the extent the Acting Secretary relies on the language of Department of Health Regulation Section 27.60(a) that allows the Department to implement "any other disease control measure the Department [of Health] . . . considers to be appropriate[,]" we note, as we did in our discussion of the language of Section 5 of the Disease Control Law, 35 P.S. § 521.5, *supra*, that this language does not provide blanket authority to create new rules and regulations out of whole cloth. Instead, directly following the "any other disease control measure" language is the qualifying language "for the surveillance of disease." 28 Pa. Code § 27.60(a). This language directly limits the disease control measures the Department of Health may consider "appropriate" to those disease control measures related to the surveillance of disease. Mask wearing is not disease surveillance. Therefore, for this additional reason, the

---

A person or animal known to have had an association with an infected person or animal which presented an opportunity for acquiring the infection.

28 Pa. Code § 27.1.

27

Acting Secretary cannot rely on Department of Health Regulation Section 27.60(a) as authority for the Masking Order.

Likewise, it cannot be said that mask wearing represents a form of "modified quarantine" as contemplated in 28 Pa. Code § 27.60(a). In addition to Section 27.60(a) referring only to infected animals or individuals and the contacts of infected animals or individuals, Section 27.1 of the Department Regulations defines "Modified quarantine" as

> [a] selected, partial limitation of freedom of movement determined on the basis of differences in susceptibility or danger of disease transmission which is designated to meet particular situations. The term includes the exclusion of children from school and the prohibition, or the restriction, of those exposed to a communicable disease from engaging in particular activities.

28 Pa. Code § 27.1. This definition of "modified quarantine" contemplates the limitation of *movement* of individuals who *have already been exposed* to a communicable disease. To equate a "partial limitation of freedom of movement" in those exposed to a communicable disease with a mask-wearing requirement for all individuals without knowledge of whether they had been exposed to COVID-19 would improperly ignore the plain language of the definitions contained in the Department of Health's own regulations.

Further, subsection (b) of the Department of Health Regulation Section 27.60 permits the Department of Health to "determine the appropriate disease control measure based upon the disease or infection, the patient's circumstance, the type of facility available, and any other available information relating to the patient and the disease or infection." 28 Pa. Code § 27.60(b). In referring to "the patient's circumstances," Department of Health Regulation Section 27.60(b) specifically

28

limits the authority and possible actions of the Department of Health to those individuals who have already contracted specific diseases, not the general, uninfected population as a whole. Additionally, the subsection's reference to "facilities available" indicates facilities for the surveillance, segregation, quarantine, or modified quarantine of individuals already known to have been exposed to a disease or infection. Accordingly, this subsection likewise fails to provide the broad authority claimed by the Acting Secretary to impose the Masking Order on otherwise healthy Pennsylvanians attending, working in, or otherwise visiting Pennsylvania's School Entities.

We further acknowledge that the Emergency Code grants the Governor the power to issue "executive orders, proclamations and regulations which shall have the effect of law." 35 Pa.C.S. § 7301(b). We further acknowledge that our Supreme Court has recognized in *Scarnati*, 233 A.3d at 705, and *DeVito*, 227 A.3d at 885, that the General Assembly has also granted the Governor the power to "[s]uspend the provisions of any regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance . . . would in any way prevent, hinder or delay necessary action in coping with the emergency," declared pursuant to Section 7301(f)(1) of the Emergency Code. 35 Pa.C.S. § 7301(f)(1). However, as discussed *supra*, in the absence of a declared emergency, and where such orders are not otherwise authorized by statute or regulation, the Governor and the executive agencies of the Commonwealth must follow the prescribed procedures for rulemaking set forth in the Commonwealth Documents Law and the Regulatory Review Act.

The instant matter presents such a scenario. The Governor did not declare a new disaster emergency following the General Assembly's approval of the

29

Concurrent Resolution that terminated the Disaster Proclamation. Instead, the Acting Secretary issued the Masking Order, which is a regulation, without complying with the mandatory rulemaking requirements of the Commonwealth Documents Law and the Regulatory Review Act. In so doing, the Acting Secretary attempted to issue her own emergency declaration about the dangers of COVID-19 and mutations thereof, including the Delta variant. *See* Masking Order at 1. The purported authority cited by the Acting Secretary in the Masking Order does not convey the authority required to promulgate a new regulation without compliance with the formal rulemaking requirements of the Commonwealth Documents Law and the Regulatory Review Act. Therefore, because the Acting Secretary did not comply with the requirements of the Commonwealth Documents Law or the Regulatory Review Act in promulgating the Masking Order, the Masking Order is void *ab initio*. For this Court to rule otherwise would be tantamount to giving the Acting Secretary unbridled authority to issue orders with the effect of regulations in the absence of either a gubernatorial proclamation of disaster emergency or compliance with the Commonwealth Documents Law and the Regulatory Review Act, as passed by the General Assembly. As this would be contrary to Pennsylvania's existing law, we decline to do so.

### III. *Conclusion*

For the foregoing reasons, we find the Masking Order to be void *ab initio*. Accordingly, we grant Petitioners' Application and deny Respondent's

30

Application.[33]   Consequently, we declare the Masking Order void *ab initio* and unenforceable.

_____
CHRISTINE FIZZANO CANNON, Judge

President Judge Brobson and Judges Cohn Jubelirer, Covey, and Crompton did not participate in this decision.

---

[33] Our determination herein that the Masking Order is void *ab initio* vitiates the need for this Court to determine whether the Acting Secretary's enactment of the Masking Order represents a violation of the non-delegation doctrine.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jacob Doyle Corman, III,
individually and as a parent of two
minor school children; Jesse Wills
Topper, individually and as a parent of
two minor school children; Calvary
Academy; Hillcrest Christian
Academy; James Reich and Michelle
Reich, individually and as parents of
three minor school children; Adam
McClure and Chelsea McClure,
individually and as parents of one
minor special needs school child;
Victoria T. Baptiste, individually and
as a parent of two special needs
school children; Jennifer D. Baldacci,
individually and as a parent of one
school child; Klint Neiman and
Amanda Palmer, individually and as
parents of two minor school children;
Penncrest School District; Chestnut
Ridge School District and West York
Area School District,
            Petitioners

         v.

Acting Secretary of the Pennsylvania
Department of Health,
            Respondent

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 294 M.D. 2021

# **O R D E R**

AND NOW, this 10th day of November, 2021, Petitioners' Application
for Summary Relief and Entry of Judgment Pursuant to Pa.R.A.P. 1532 and In
Accordance with the Court's September 27, 2021 Order is GRANTED, and

Respondent's Application for Summary Relief filed by Alison M. Beam, the Acting Secretary of Health (Acting Secretary), is DENIED.

The "Order of the Acting Secretary of the Pennsylvania Department of Health Directing Face Coverings in School Entities," issued by the Acting Secretary on August 31, 2021, is declared void *ab initio*.

Respondent's "Application for Relief in the Nature of a Motion to Quash Notice to Attend and Subpoena *Ad Testificandum* Directed to Alison M. Beam, Acting Secretary of Health" is DISMISSED as moot.

_____
CHRISTINE FIZZANO CANNON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jacob Doyle Corman, III, individually   :
and as a parent of two minor school   :
children; Jesse Wills Topper, individually   :
and as a parent of two minor school   :
children; Calvary Academy; Hillcrest   :
Christian Academy; James Reich and   :
Michelle Reich, individually and as parents   :
of three minor school children; Adam   :
McClure and Chelsea McClure, individually :
and as parents of one minor special needs   :
school child; Victoria T. Baptiste,   :
individually and as a parent of two special   :
needs school children; Jennifer D. Baldacci, :
individually and as a parent of one school   :
child; Klint Neiman and Amanda Palmer,   :
individually and as parents of two minor   :
school children; Penncrest School District;   :
Chestnut Ridge School District and   :
West York Area School District,   :
  :
     Petitioners   :
  :
    v.   : No. 294 M.D. 2021
          : Argued: October 20, 2021
Acting Secretary of the Pennsylvania   :
Department of Health,   :
  :
     Respondent   :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, Judge
     HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE MICHAEL H. WOJCIK, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge
     HONORABLE ELLEN CEISLER, Judge


DISSENTING OPINION
BY JUDGE WOJCIK          FILED: November 10, 2021

    I dissent.

On August 31, 2021, the Acting Secretary (Secretary) of the Pennsylvania Department of Health (DOH) issued an Order directing that face coverings must be worn by each teacher, child/student, staff, or visitor working, attending, or visiting a school while indoors regardless of his or her 2019 novel coronavirus (COVID-19) vaccination status. *See* Petitioners' Amended Petition for Review (PFR), Exhibit A at 1-6. The Secretary states her reasoning for issuing the Order, in relevant part, as follows:

> [COVID-19] is a contagious disease that continues spreading rapidly from person to person in the world, the United States, and this Commonwealth. Despite periods of time when the virus seemed to wane, it, like all viruses, has continued to mutate, and spread. As of the date of this Order, there have been 1,300,368 cases and 28,235 deaths in this Commonwealth caused by the still present and ongoing pandemic. At this time, the Centers for Disease Control and Prevention (CDC) estimates that the Delta variant is the predominant strain in the Commonwealth. COVID-19 can be transmitted from any person who is infected, even if they [sic] have no symptoms and, with the Delta variant, even if they [sic] have been vaccinated. Symptoms of COVID-19 may include fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, or diarrhea. Older adults and people who have serious chronic medical conditions were considered to be at higher risk for serious illness. Now, because of the rise of the Delta variant, increasing disease and hospitalizations, and the inability to obtain vaccines for a large part of that vulnerable group, children are more and more at risk.
>
> There are several reasons for the increasing risk to children from COVID-19. The risk overall to the unvaccinated population is rising. Given the rise in hospitalizations and deaths, and despite COVID-19 vaccines being available, the Delta variant of the SARS-CoV-2 virus is causing the rate of cases of COVID-19 to increase. The Delta variant

is more infectious, and it is leading to increased transmissibility. Additionally, data [are] suggesting that the Delta variant may cause more severe illness than previous strains of SARS-CoV-2; however, not all of our population is able to get vaccinated. As of yet, no vaccine has been approved for children under the age of 12. As of August 26, 2021, the total number of cumulative cases reported in children in the Commonwealth was 23,974 in the 0-4 years of age cohort, 56,039 in the 5-12 years of age cohort, and 88,205 in the 12-18 years of age cohort.

In addition to the concern that COVID-19 spreads quickly and dangerously among children, there are concerns that school closures create health issues for children too. Maintaining in-person instruction and socialization are necessary for the health and well-being of our children. In view of this serious concern for our nation's children, the CDC has issued a strong recommendation for masking of all persons, teachers, students, and staff within the nation's schools, regardless of vaccination status, to create a multi-layered approach for fighting COVID-19 and to keep our schools open for in-person education. In addition, the American Academy of Pediatrics (AAP) has also strongly recommended masking in schools. Finally, recent studies have shown that mask-wearing in schools has contributed to lower levels of COVID-19 transmission among students and staff and allowed for the continued in-person attendance. Requiring face coverings in schools, therefore, balances the concerns for the mental health of our children with the need to protect them against a disease that is growing more virulent as we struggle to protect the most vulnerable members of our population. In accordance with the recommendations of the CDC and AAP and based upon the rising case numbers and hospitalizations in general in the Commonwealth, including the number of cases in our children, as well as the need to protect and maintain in-person education for the health and well-being of those children, I am issuing this Order to protect the ability of our schools to continue to educate our children, and of our children to receive in-person instruction in the safest environment possible.

COVID-19 is a threat to the public's health for which the [Secretary] may order general control measures. This authority is granted to the [Secretary] pursuant to Pennsylvania law. *See* [Section 5 of the Disease Prevention and Control Law of 1955 (Disease Control Law)];[1] [Section 2102(a) of The Administrative Code of

---

[1] Act of April 23, 1956, P.L. (1955) 1510, *as amended*, 35 P.S. §521.5. Section 5 states, in relevant part: "Upon the receipt by . . . [DOH] . . . of a report of a disease which is subject to isolation, quarantine, or any other control measure, . . . [DOH] shall carry out the appropriate control measures in such manner and in such place as is provided by rule or regulation." In addition, Section 3 of the Disease Control Law states, in relevant part:

> (a) Local boards and departments of health shall be primarily responsible for the prevention and control of communicable and non-communicable disease, including disease control in public and private schools, in accordance with the regulations of the [State Advisory Health Board (Board)] and subject to the supervision and guidance of [DOH].

> (b) [DOH] shall be responsible for the prevention and control of communicable and non-communicable disease in any municipality which is not served by a local board or department of health, including disease control in public and private schools.

> (c) If the [S]ecretary finds that the disease control program carried out by any local board or department of health is so inadequate that it constitutes a menace to the health of the people within or without the municipalities served by the local board or department of health, he may appoint agents of [DOH] to supervise or to carry out the disease control program of the particular local board or department of health until he determines that the menace to the health of the people no longer exists and that the local board or department of health is able to carry out an adequate disease control program.

35 P.S. §521.3. As the Pennsylvania Supreme Court has explained:

> We find in the [Disease Control Law] a holistic scheme that, for purposes of disease prevention and control, favors local regulation as informed by the expertise of a dedicated local board or department of health over state-level regulation, and correspondingly allows local lawmakers to impose more stringent

**(Footnote continued on next page…)**

MHW-4

1929 (Administrative Code)];[2] and [the DOH] regulation at 28 Pa. Code §27.60 (relating to disease control

regulations than state law provides. Thus, in priority order, a municipality with a board or department of health may enact ordinances or promulgate rules and regulations in service of disease prevention and control. Where a municipality lacks its own board or department of health, but lies within the jurisdiction of a county department of health, the municipality may enact such ordinances, while the county board or department of health may issue rules and regulations. Absent a municipal or county board or department of health, a municipality falls within the jurisdiction of the [Board].

With this account in mind, viewing [Section 16 of the Disease Control Law, 35 P.S.] §521.16, in its entirety, certain principles are clear. First, state-level regulations must be devised and promulgated by [the Board] with the Secretary['s] oversight. Second, at the local level, municipalities with the benefit of access to similar expertise, whether in the form of a municipal board or department of health or a department or board administered by the county, enjoy the prerogative of enacting additional laws or regulations, provided they are no *less* strict than state law and regulations on the same subject. *See* [Section 16(c) of the Disease Control Law,] 35 P.S. §521.16(c) (allowing such ordinances that "are not less strict than the provisions of this act or the rules and regulations issued thereunder" by the [B]oard).

*Pennsylvania Restaurant and Lodging Association v. City of Pittsburgh*, 211 A.3d 810, 828 (Pa. 2019) (emphasis in original).

[2] Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §532(a). Section 2102(a) states: "[DOH] shall have the power, and its duty shall be . . . [t]o protect the health of the people of this Commonwealth, and to determine and employ the most efficient and practical means for the prevention and suppression of disease[.]" *See also* Section 2111(a) and (b) of the Administrative Code, 71 P.S. §541(a) and (b) ("The [Board] shall have the power, and its duty shall be . . . [t]o advise the [Secretary] on such matters as he may bring before it . . . [and t]o make such reasonable rules and regulations, not contrary to law, as may be deemed by the [B]oard necessary for the prevention of disease, and for the protection of the lives and health of the people of the Commonwealth, and for the proper performance of the work of [DOH], and such rules and regulations, when made by the [B]oard, shall become the rules and regulations of [DOH].").

measures).[3] Particularly, [DOH] has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* [Section 5 of the Disease Control Law]; [Section 2102(a) of the Administrative Code and Section 8(a) of the Act of April 27, 1905, P.L. 312, *as amended*, 71 P.S. §1403(a) (DOH Act)];[4] [and Section 27.60 of DOH's regulations]. With the opening of the 2021 school year at hand, and case counts and hospitalizations continuing to rise, there is a need for additional action to protect our Commonwealth's children.

PFR, Exhibit A at 1-2 (footnotes omitted).

---

[3] 28 Pa. Code §27.60. Section 27.60(a) of DOH's regulations states, in pertinent part:

(a) [DOH] . . . shall direct isolation of a person . . . with a communicable disease or infection; surveillance, segregation, quarantine or modified quarantine of contacts of a person . . . with a communicable disease or infection; and any other disease control measure [DOH] . . . considers to be appropriate for the surveillance of disease, when the disease control measure is necessary to protect the public from the spread of infectious agents.

28 Pa. Code §27.60(a).

In turn, Section 27.1 of DOH's regulations defines "isolation," in relevant part, as

[t]he separation for the communicable period of an infected person . . . from other persons . . . in such a manner as to prevent the direct or indirect transmission of the infectious agent from infected persons . . . to other persons . . . who are susceptible or who may spread the disease to others.

28 Pa. Code §27.1. Additionally, Section 27.1 defines "segregation," in pertinent part, as "[t]he separation for special control and observation of one or more persons . . . from other persons . . . to facilitate the control of a communicable disease." *Id.*

[4] Section 8(a) of the DOH Act states: "It shall be the duty of [DOH] to protect the health of the people of the State, and to determine and employ the most efficient and practical means for the prevention and suppression of disease."

In Section 2 of the Order, the Secretary imposes a "General Masking Requirement" requiring that "[e]ach teacher, child/student, staff, or visitor working, attending, or visiting a School Entity[5] shall wear a face covering indoors, regardless of vaccination status, except as set forth in Section 3.[6]" PFR, Exhibit A at 4. The Secretary also stated she issued the Order "in order to prevent and control the spread of disease," and that "[t]his Order shall take effect at 12:01 a.m. on September 7, 2021, and shall remain in effect until otherwise terminated." *Id.* at 3, 6. Petitioners

---

[5] Section 2 of the Order defines "School Entity," in relevant part, as follows:

(1) A public PreK-12 school.
(2) A brick and mortar or cyber charter school.
(3) A private or parochial school.
(4) A career and technical center (CTC).
(5) An intermediate unit (IU).
(6) A PA Pre-K Counts program, Head Start Program, Preschool Early Intervention program, or Family Center.
(7) A private academic nursery school and local-funded prekindergarten activities.
(8) A childcare provider licensed by the Department of Human Services of the Commonwealth.

PFR, Exhibit A at 3-4.

[6] Section 3 of the Order lists the following exceptions to its application: (1) if wearing a mask while working would create an unsafe condition in which to operate equipment or execute a task under local, state, or federal regulations or workplace safety guidelines; (2) if wearing a mask would either cause a medical condition, or exacerbate an existing one, including respiratory issues that impede breathing, a mental health condition, or a disability; (3) when necessary to confirm an individual's identity; (4) while working alone and isolated from others with little or no expectation of in-person contact; (5) while communicating with someone who is hearing impaired or has another disability requiring sight of the mouth in order to communicate; (6) when the individual is under two years old; (7) when the individual is engaged in an activity that cannot be performed while wearing a mask, such as eating or drinking, or playing an instrument, or participating in a high intensity aerobic or anaerobic activity, including during physical education class, in a well-ventilated area; and (8) while participating in a sports activity or event either indoors or outdoors. PFR, Exhibit A at 4-5.

MHW-7

subsequently filed the PFR seeking declaratory and injunctive relief based on the Order's purported invalidity, and Petitioners and the Secretary filed cross-Applications for Summary Relief (ASR).[7]

On September 13, 2021, this Court filed an order framing the issues to be considered in this matter:

> [W]hether the August 31, 2021 [Order] constitutes a rule or regulation subject to the provisions of the Regulatory Review Act, Act of June 25, 1982, P.L. 633, *as amended*, 71 P.S. §§745.1-745.15, and whether said [Order] violates the principles governing the delegation of administrative authority.

---

[7] As this Court has recently observed:

> Applications for summary relief filed in this Court's original jurisdiction are governed by Pennsylvania Rule of Appellate Procedure 1532(b), Pa. R.A.P. 1532(b), which provides that "[a]t any time after the filing of a petition for review . . . , the court may enter judgment if the right of the applicant thereto is clear." An application for summary relief under Rule 1532(b) is evaluated according to standard for a motion for summary judgment. A motion for summary relief may only be granted when "**the dispute is legal rather than factual**," there is **no genuine issue of material fact**, and the moving party is entitled to judgment as a matter of law. The evidence is to be reviewed in a light most favorable to the non-moving party. "Even if the facts are undisputed, the moving party has the burden of proving that its right to relief is so clear as a matter of law that summary relief is warranted." "Bold unsupported assertions of conclusory accusations cannot create genuine issues of material fact." "Summary [relief] may be entered only in cases that are clear and free from doubt."

*Delaware Riverkeeper Network v. Department of Environmental Protection* (Pa. Cmwlth., No. 525 M.D. 2017, filed August 3, 2021), slip op. at 13 (citations and footnote omitted); *see also* Pa. R.A.P. 126(b) ("As used in this rule, 'non-precedential decision' refers to . . . an unreported memorandum opinion of the Commonwealth Court filed after January 15, 2008. [] Non-precedential decisions . . . may be cited for their persuasive value.").

MHW-8

**I.**

With regard to the first issue presented herein, the Pennsylvania Supreme Court has explained:

> Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly, which is, as a general rule, by way of recourse to procedures prescribed in the Commonwealth Documents Law,[8] the Regulatory Review Act, and the Commonwealth Attorneys Act.[9] When an agency acts under the general rule and promulgates published regulations through the formal notice, comment, and review procedures prescribed in those enactments, its resulting pronouncements are accorded the force of law and are thus denominated "legislative rules." *See Borough of Pottstown* [*v. Pennsylvania Municipal Retirement Board*, 712 A.2d 741, 743 (Pa. 1998)]. *See generally* Mark Seidenfeld, *Substituting Substantive for Procedural Review of Guidance Documents*, 90 Tex. L.Rev. 331, 335 (2011) ("The canonical mode by which agencies define the meaning of statutes and regulations or establish policy is legislative rulemaking.") (footnote omitted).
>
> Non-legislative rules—more recently couched (in decisions and in the literature) as "guidance documents"—comprise a second category of agency pronouncements recognized in administrative law practice. These "come in an abundance of formats with a diversity of names, including guidances, manuals, interpretive memoranda, staff instructions, policy statements, circulars, bulletins, advisories, press releases and others." Robert A. Anthony, Commentary, *A Taxonomy of Federal Agency Rules*, 52 Admin. L.Rev. 1045, 1046 (2000). When such documents fairly may be said to merely explain or offer specific and

---

[8] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§1102-1602, and 45 Pa. C.S. §§501-907.

[9] Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §§732-101–732-506.

conforming content to existing statutes or regulations within the agency's purview, they are regarded as "interpretive rules," which generally are exempt from notice-and-comment rulemaking and regulatory-review requirements. *See Borough of Pottstown*, [712 A.2d at 743]; Seidenfeld, *Substituting Substantive for Procedural Review*, 90 Tᴇx. L.Rᴇv. at 346 (explaining that an interpretive rule "is meant to explain preexisting legal obligations and relations that are embodied in the agency's authorizing statutes and regulations") (footnote omitted). Additionally, "statements of policy"—or agency pronouncements which are not intended to bind the public and agency personnel, but rather, merely express an agency's tentative, future intentions—also are not regulations subject to notice-and-comment rulemaking and regulatory-review requirements. *See Borough of Pottstown*, [712 A.2d at 743 n.8].

*Northwestern Youth Services, Inc. v. Department of Public Welfare*, 66 A.3d 301, 310-11 (Pa. 2013) (citation and footnote omitted).[10]

---

[10] With respect to the various species of non-legislative rules, such as the Secretary's Order issued herein, Professor Anthony has further explained:

> Documents that are not legislative rules, but that nevertheless fit [Section 551 of Administrative Procedures Act's, 5 U.S.C. §551,] definition of "rule," are called "non[-]legislative rules." They come in an abundance of formats with a diversity of names, including guidances, manuals, interpretive memoranda, staff instructions, policy statements, circulars, bulletins, advisories, press releases and others. Non[-]legislative rules do not carry the force of law. They are potentially exempt from notice[]and[]comment requirements under the "interpretative rules" exemption (for documents that interpret) or under the "general statements of policy" exemption (for some documents that do not interpret). Whether a document will be exempt in a given case depends upon further analysis.
>
> That analysis is a simple one for non[-]legislative rules that interpret existing legislation. All such documents (more precisely, those portions of the documents that genuinely interpret) fall

**(Footnote continued on next page…)**

To my mind, the Secretary's Order is a valid interpretive rule that tracks the statutory and regulatory authority conferred upon her, and it is not a rule or regulation that must be promulgated under the Regulatory Review Act. As outlined above, Section 2102(a) of the Administrative Code states: "[DOH] shall have the power, and its duty shall be . . . [t]o protect the health of the people . . . and to determine and employ the most efficient and practical means for the prevention and suppression of disease[.]" 71 P.S. §532(a). Likewise, Section 8(a) of the DOH Act states: "It shall be the duty of [DOH] to protect the health of the people . . . and to determine and employ the most efficient and practical means for the prevention and suppression of disease." 71 P.S. §1403(a). Additionally, Section 5 of the Disease

---

squarely within the exemption for "interpretative rules," and need not undergo notice[]and[]comment. The theory is that the agency is not making new law, but is merely spelling out or explaining positive legal substance that was already inherent in the statute or legislative rule or line of decisional law being interpreted. Thus, the public-participation procedures required by [S]ection 553[, 5 U.S.C. §553,] for making new law are not needed.

In practice, the courts often have quite an uneasy time deciding whether a document does or does not interpret. It is in the application of the interpretative rule exemption, not in its conception, that perplexity intrudes. It is notoriously difficult to say with confidence that a given non[-]legislative document actually interprets a given legislative document, such that the meaning of the former flows fairly from and is justified by the latter. But when the court ultimately concludes that a document does so interpret, the law is utterly clear that notice[]and[]comment need not have been used in its promulgation. (Good practice may counsel agencies voluntarily to observe notice[]and[]comment before issuing an interpretation in many situations, such as where the interpretation would extend the practical scope of the agency's jurisdiction, would alter the obligations of private parties or would modify eligibility for entitlements.)

*A Taxonomy of Federal Agency Rules*, 52 ADMIN. L.REV. at 1046-47.

Control Law states, in relevant part: "Upon the receipt by . . . [DOH] . . . of a report of a disease which is subject to isolation, quarantine, or any other control measure, . . . [DOH] shall carry out the appropriate control measures in such manner and in such place as is provided by rule or regulation." 35 P.S. §521.5. In turn, as stated above, Section 27.60(a) of DOH's regulations provides, in relevant part, that "[DOH] . . . shall direct isolation of a person . . . with a communicable disease or infection . . . [or] segregation, quarantine or modified quarantine of contacts of a person . . . with a communicable disease or infection . . . ." 28 Pa. Code §27.60(a).

As extensively outlined in the Secretary's Order, the increase in COVID-19 cases caused by the Delta variant of the SARS-CoV-2 virus at the time of its issuance, in combination with the concern of the quick and dangerous spread among unvaccinated children, while considering the mental health needs of students to return to in-person instruction in schools, compelled the Secretary to follow the advice of the CDC and AAP to temporarily impose the least restrictive and "most efficient and practical means" of ensuring the safety of the vulnerable student population.[11] In the absence of universal testing of all individuals who may come

---

[11] In this regard, the Secretary's rulemaking authority under the Administrative Code, the DOH Act, and the Disease Control Law must be distinguished from the Board's authority to promulgate regulations with respect to DOH operations as outlined above in the Disease Control Law. The Pennsylvania Supreme Court has explained this important distinction as follows:

> There is a well-recognized distinction in the law of administrative agencies between the authority of a rule adopted by an agency pursuant to what is denominated by the text writers as *legislative* rule-making power and the authority of a rule adopted pursuant to *interpretative* rule-making power. The former type of rule 'is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the Legislative body,' and 'is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to

**(Footnote continued on next page…)**

MHW-12

into contact with a student while in a "School Entity," the use of masks by all individuals in this setting during the life of the COVID-19 pandemic is an appropriate and limited "isolation" or "segregation" measure to prevent the spread of an airborne virus causing, in some cases, an asymptomatic disease. This temporary measure is "the most efficient and practical means for the prevention and suppression of [this] disease," as mandated by Section 2102(a) of the Administrative Code and Section 8(a) of the DOH Act,[12] and is a specifically authorized mode of

proper procedure, and (c) reasonable.' A court, in reviewing such a regulation, 'is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action . . . involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles . . . as to be the expression of a whim rather than an exercise of judgment.'

An interpretative rule on the other hand depends for its validity not upon a law-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation.

*Uniontown Area School District v. Pennsylvania Human Relations Commission*, 313 A.2d 156, 169 (Pa. 1973) (emphasis in original and citations omitted). As outlined above, because the Secretary's Order tracks the statutory and regulatory powers conferred thereunder, it is a valid interpretive rule issued pursuant to her rulemaking authority.

[12] Where, as here, the Secretary has extensively outlined the basis upon which she issued the Order, the Pennsylvania Supreme Court has cautioned:
**(Footnote continued on next page…)**

> By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion.

*Blumenschein v. Pittsburgh Housing Authority*, 109 A.2d 331, 334-35 (Pa. 1954) (footnotes omitted and emphasis in original).

As provided within the text of the Order, the Secretary stated the reasoning underlying the exercise of her statutory and regulatory discretion in formulating the appropriate means for protecting the vulnerable statewide student population in the School Entity setting during the ongoing COVID-19 pandemic. The pleadings in this case simply do not demonstrate the requisite "manifest and flagrant abuse of discretion or a purely arbitrary execution of the [Secretary's] duties or functions" to enable this Court to inquire into the wisdom or details of her actions in this regard. Further, as extensively explained throughout this Dissenting Opinion, the Secretary's Order does not constitute a rule or regulation subject to the notice and comment requirements of either the Regulatory Review Act or the Commonwealth Documents Law, so no extra-agency input was required prior to the Secretary's issuance of the Order pursuant to her statutory and regulatory authority. In sum, although this Court may have reached a different conclusion based on the available information that was relied upon by the Secretary in issuing the Order, it is inappropriate to substitute our judicial discretion for the Secretary's administrative discretion conferred by Section 2102(a) of the Administrative Code and Section 8(a) of the DOH Act to employ "the most efficient and practical means for the prevention and suppression of" COVID-19 in the School Entity setting during the life of this pandemic.

MHW-14

prevention provided by Section 5 of the Disease Control Law and Section 27.60(a) of DOH's regulations.[13]

Moreover, on October 21, 2021, while this matter was pending, the Joint Committee on Documents (Joint Committee) issued the following Order:

> Pursuant to [S]ection 7.1 of the Regulatory Review Act[,[14]] the [Joint Committee] finds the following:
>
> 1. Findings.
>
> The Health Committee of the House of Representatives [(House Committee)] petitioned the [Joint Committee] to determine whether the order of the [Secretary], issued August 31, 2021, should be

---

[13] Likewise, Section 2106(b) of the Administrative Code states:

> The [DOH] shall have the power, and its duty shall be:
>
> * * *
>
> (b) to establish and enforce quarantines, in such manner, for such period, and with such powers, as may now or hereafter be provided by law, to prevent the spread of diseases declared by law or by the [DOH] to be communicable diseases.

71 P.S. §536(b) (emphasis added).

[14] Added by the Act of June 30, 1989, P.L. 633, *as amended*, 71 P.S. §745.7a. Section 7.1 of the Regulatory Review Act states:

> If the [Independent Regulatory Review Commission (Commission)] or [a standing committee of the Senate or House of Representatives (committee)] finds that a published or unpublished document should be promulgated as a regulation, the [C]ommission or committee may present the matter to the [Joint Committee]. The [Joint Committee] shall determine whether the document should be promulgated as a regulation and may order an agency either to promulgate the document as a regulation within 180 days or to desist from the use of the document in the business of the agency.

promulgated as a regulation.  A legislative standing committee may challenge an agency's unpromulgated order under [S]ection 7.1 of the Regulatory Review Act[.]

The [O]rder is an instrument issued by [DOH] under the authority of the Commonwealth and is, therefore, a document for purposes of Pennsylvania's laws governing Commonwealth documents.  Def[inition] of "document," [S]ection 102 of the Commonwealth Documents Law[, Act of July 9, 1970, P.L. 477, *as amended*,] 45 P.S. §1102;[15] *see also* [Section 1.4 of the Pennsylvania Code,] 1 Pa. Code §1.4.[16]  A regulation is "any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency . . . ."  Def[inition] of "regulation," [S]ection 3 of the Regulatory Review Act[,] 71 P.S. §745.3[;] 1 Pa. Code §1.4.[17]  As a substantive rule issued under an agency's statutory authority, a regulation must be promulgated in accordance with the Commonwealth Documents Law.  Def[inition] of "regulation," [S]ection 3 of the Regulatory Review Act[,] 71 P.S. §745.3[;] *see also* Article II of the Commonwealth Documents Law, [45 P.S. §§1201-1208].

2.    Determination.

Based on the record, the [Joint Committee], by a vote of seven to four, finds that the [House Committee]

---

[15] Section 102 of the Commonwealth Documents Law defines "Document," in pertinent part, as "any . . . order, regulation, rule, statement of policy, adjudication, certificate, license, permit, notice or similar instrument issued, prescribed or promulgated by or under the authority of this Commonwealth."

[16] Section 1.4 of the Pennsylvania Code defines "Document," in relevant part, as "an order, regulation, rule, statement of policy, adjudication, certificate, license, permit, notice or similar instrument issued, prescribed or promulgated by or under the authority of the Commonwealth."

[17] Section 1.4 of the Pennsylvania Code defines "Regulation" as "[a] rule or regulation or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of a statute administered by or relating to the agency, or prescribing the practice or procedure before the agency."

has failed to show that the [Secretary's Order], issued August 31, 2021, should be promulgated as a regulation.

While the [Secretary's Order] imposes a legal requirement to wear face coverings in schools and other locations identified in the [O]rder, [the Secretary] issued the [O]rder under existing statutory and regulatory authority. [DOH's] regulatory authority to bypass the rulemaking process is authorized by [Section 27.60 of its regulations,] 28 Pa. Code §27.60[;] [S]ection 2101(a) of the [Administrative Code], 71 P.S. §532(a)[;] [S]ection 8(a) of the [DOH Act], 71 P.S. §1403(a)[;] and [S]ection 2106[(b)] of the [Administrative Code], 71 P.S. §536[(b)]. (Footnote Omitted).[18]

As the Commonwealth entity empowered to determine whether an administrative agency rule is required to be promulgated as a rule or regulation subject to the provisions of the Regulatory Review Act[19] and the Commonwealth Documents Law,[20] this Court should defer to the Joint Committee's expertise and

---

[18] By an October 29, 2021 order, this Court granted the Secretary's Application for Relief in the Nature of a Motion for Leave to Supplement the Record, treating the application as a post-submission communication under Pa. R.A.P. 2501(a), and docketed the Joint Committee's October 21, 2021 Order in this matter as an addendum to the Secretary's ASR. Additionally, the House Committee has petitioned this Court to review the Joint Committee's October 21, 2021 Order. *See The Honorable Kathy L. Rapp v. Department of Health* (Pa. Cmwlth., No. 1184 C.D. 2021).

[19] *See* Section 7.1 of the Regulatory Review Act, 71 P.S. §745.7a ("The [Joint Committee] shall determine whether the document should be promulgated as a regulation and may order an agency either to promulgate the document as a regulation within 180 days or to desist from the use of the document in the business of the agency."); *see also* Section 11(a) of the Regulatory Review Act, 71 P.S. §745.11(a) ("For the purposes of reviewing the regulations of the [C]ommission and otherwise satisfying the requirements of this act, the [Joint Committee] shall exercise the rights and perform the functions of the [C]ommission; and the [C]ommission shall exercise the rights and perform the functions of an agency under this act.").

[20] Section 502(d) of the Commonwealth Documents Law states that "[t]he [Joint Committee] shall exercise the powers and perform the duties vested in and imposed upon it by this part and any other powers or duties vested in and imposed upon the [Joint Committee] by law." 45 Pa. C.S. §502(d). In turn, Section 503 of the Commonwealth Documents Law states:
**(Footnote continued on next page…)**

MHW-17

determination that the Secretary's Order does not constitute a rule or regulation within the requirements of either of these statutes, as well as the Secretary's determination that her Order was properly issued according to her statutory and regulatory authority. As the Pennsylvania Supreme Court has explained:

> Subject to the provisions of [S]ection 732 (relating to required contractual arrangements), the manner in which the [Pennsylvania Code], the permanent supplements thereto, and the [Pennsylvania Bulletin], shall be published, and all other matters with respect thereto not otherwise provided for in this part shall be prescribed by regulations promulgated or orders adopted by the [Joint Committee]. The [Joint Committee] shall administer this part and Subchapter A of Chapter 3 of Title 2 (relating to regulations of Commonwealth agencies) with a view toward encouraging the widest possible dissemination of documents among the persons affected thereby which is consistent with the due administration of public affairs.

45 Pa. C.S. §503. *See also* Section 206 of the Commonwealth Documents Law, 45 P.S. §1206 ("The agency text of all regulations and other documents, required or authorized to be deposited with the Legislative Reference Bureau [(Bureau)] by this act shall be prepared in such form and format as may be prescribed by regulations promulgated by the [Joint Committee]."); Section 701 of the Commonwealth Documents Law, 45 Pa. C.S. §701 ("It shall be the duty of the [Bureau], subject to the policy supervision and direction of the [Joint Committee], to compile, edit and supplement . . . an official legal codification, to be divided into titles of convenient size and scope, and to be known as the 'Pennsylvania Code.'"); Section 722(d) of the Commonwealth Documents Law, 45 Pa. C.S. §722(d) ("If an agency and the [B]ureau disagree concerning the form or format of a document required or authorized to be deposited with the [B]ureau, the agency may refer the matter to the [Joint Committee], which shall resolve the conflict pursuant to the standards and procedures provided by [S]ection 723(a) (relating to processing of deposited documents)."); 1 Pa. Code §3.1(a)(2) and (9) ("The following documents shall be codified in the [Pennsylvania] Code: . . . [a]dministrative and gubernatorial regulations [and d]ocuments or classes of documents which the Governor, the Joint Committee or the Bureau finds to be general and permanent in nature."); 1 Pa. Code §17.94 ("Section 502(d) of [the Commonwealth Documents Law] (relating to [the Joint Committee]) provides that the Joint Committee shall exercise the powers and perform the duties vested in and imposed upon it by the act and any powers and duties subsequently vested in and imposed upon the Joint Committee by statute.").

> It is well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation. . . . Thus, our courts will not disturb administrative discretion in interpreting legislation within an agency's own sphere of expertise absent fraud, bad faith, abuse of discretion or clearly arbitrary action.

*Winslow-Quattlebaum v. Maryland Insurance Group*, 752 A.2d 878, 881 (Pa. 2000) (citations omitted).

Based on the allegations raised in the PFR, it is clear that neither the Secretary nor the Joint Committee acted with fraud or bad faith, or that either committed an abuse of discretion or clearly arbitrary action. As a result, unlike the Majority, I do not conclude that the Secretary's Order is void *ab initio* as an improperly promulgated rule or regulation subject to the requirements of the Regulatory Review Act, the Commonwealth Documents Law, or in the absence of a gubernatorially-declared disaster emergency issued pursuant to Section 7301(c) of Pennsylvania's Emergency Management Services Code, 35 Pa. C.S. §7301(c). This conclusion is amply supported by the Joint Committee's October 21, 2021 Order. Accordingly, unlike the Majority, I would grant the Secretary's ASR, and deny Petitioners' ASR, with respect to the first issue in this case.

## II.

Regarding the second issue presented in this matter, the Pennsylvania Supreme Court has stated:

> [T]he separation of powers doctrine divides the functions of government equally between the executive, legislative, and judicial branches. As we recently explained,

MHW-19

Article II, [s]ection 1 of the Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, §1. That is why, when the General Assembly empowers some other branch or body to act, our jurisprudence requires "that the basic policy choices involved in 'legislative power' actually be made by the [l]egislature as constitutionally mandated." This constraint serves two purposes. First, it ensures that duly authorized and politically responsible officials make all of the necessary policy decisions, as is their mandate per the electorate. And second, it seeks to protect against the arbitrary exercise of unnecessary and uncontrolled discretionary power.

Although the legislature may not delegate legislative power, it may, in some instances, assign the authority and discretion to execute or administer a law, subject to two fundamental limitations: First, the General Assembly must make "the basic policy choices." Once it does so, the General Assembly may "impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions" of the legislation. Second, the legislation must include "adequate standards which will guide and restrain the exercise of the delegated administrative functions." In determining whether the legislature has established adequate standards, "we are not limited to the mere letter of the law, but must look to the underlying purpose of the statute and its reasonable effect." Further, the General Assembly does not delegate legislative powers by delegating mere details of administration.

*Germantown Cab Company v. Philadelphia Parking Authority*, 206 A.3d 1030, 1047 (Pa. 2019) (citations omitted).

The provisions of the Administrative Code and the Disease Control Law provide DOH broad authority "[t]o protect the health of the people of [Pennsylvania], and to determine and employ the most efficient and practical means

for the prevention and suppression of disease." 71 P.S. §§532(a), 1403(a).[21] However, the Disease Control Law and the associated regulations outline the parameters within which the Secretary and the Board, as well as local boards and departments, may operate with respect to the containment of communicable diseases within public and private schools. *See* Sections 4 and 5 of the Disease Control Law; Section 27.60 of DOH's regulations. Specifically, the Secretary may only "carry out the appropriate control measures in such manner and in such place as is provided by rule or regulation," upon the receipt of "a report of a disease which is subject to isolation, quarantine, or any other control measure." 35 P.S. §521.5. *See also Wolf v. Scarnati*, 233 A.3d 679, 705 (Pa. 2020) ("Broad discretion and standardless discretion are not the same thing."); *Gilligan v. Pennsylvania Horse Racing Commission*, 422 A.2d 487, 490 (Pa. 1980) ("The latitude of the standards controlling exercise of the rulemaking powers expressly conferred on the Commission must be viewed in light of the broad supervisory task necessary to accomplish the express legislative purpose.").

---

[21] In this regard, the Pennsylvania Supreme Court has observed:

> In *Archbishop O'Hara's Appeal*, [131 A.2d 587, 594 (Pa. 1957)], the standard of "the promotion of the health, safety, morals and general welfare * * *" was deemed sufficient to limit the administrative exercise of the zoning power to grant or refuse a special exception. The similarly general standard of "detrimental to welfare, health, peace and morals of the inhabitants of the neighborhood" was held to provide adequate guidance for the administrative refusal of a liquor license in *Tate Liquor License Case*, [173 A.2d 657 (Pa. Super. 1961)]. *See also Dauphin Deposit Trust Co. v. Myers*, [130 A.2d 686, 689 (Pa. 1957)] (statement that "adequacy or inadequacy of banking facilities" a proper criterion).

*DePaul v. Kauffman*, 272 A.2d 500, 503 (Pa. 1971).

In this case, the Secretary has acted according to the statutory and regulatory authority conferred upon her to protect the vulnerable student population in "School Entities" by the least restrictive and "the most efficient and practical means" available while the lethal COVID-19 pandemic continues to infect and kill the residents of this Commonwealth. The authority conferred upon her in this regard in no way encroaches upon the legislative power provided in article II, section 1 of the Pennsylvania Constitution.

Accordingly, unlike the Majority, I would grant the Secretary's ASR and deny Petitioners' ASR, with respect to the second issue as well, and dismiss Petitioners' PFR.

_____
MICHAEL H. WOJCIK, Judge